RICHARD CATLIN *vs.* HENRY HENTON and JOHN WRIGRTMAN, impleaded, &c., Appellants.

APPEAL FROM CIRCUIT COURT, MILWAUKEE COUNTY.

Heard November 3.]　　　　　　　　[Decided November 15, 1859.

*Mortgage—Finding—Promissory Note—Equity—Appeal— Practice—Felony, compounding of.*

In an action to foreclose a mortgage the court found " that the note and mortgage were made and delivered, and assigned, *as in the bill set forth*, and that

Catlin vs. Henton et al.

the plaintiff is the *bona fide* holder thereof. In the conflict of testimony I must find that the defense has not been sufficiently established, and that judgment of foreclosure must be ordered :" Held that this finding was a sufficient compliance with the statute.

When the pleadings show the amount due, the finding need not state that amount, the pleadings are sufficient on that point.

Although a note be described as collateral to a mortgage, instead of the mortgage being collateral to to the note, it will not for that reason take from the note its character of negotiability, nor change its character, so as to make the debt incident to the mortgage.

The supreme court will, on an appeal in an equity case, look into the testimony to see if the facts proved will sustain the finding and judgment. The rule is different in a case at law.

A finding which is general in its form, and only finds the facts as alleged in the complaint, is a sufficient complance with the code in an equity case to support a judgment. Where a finding is actually filed in an an equity case, the supreme court will not examine it with the same strictness as in a case at law.

A defense to a note given to compound a felony must either confess the felony, or that a prosecution for it had been commenced before the making of the note, or the defense will be of no avail. A mere threat to commence a prosecution, will not sustain the defense.

It would seem that §§ 18, 19 and 20, chap. 132, R. S., relating to trials by the court, refer only to cases where the judge acts in the place of the jury ; and the bill of exceptions is to have the same effect and purpose as on a trial by jury, not for the purpose of trying over the questions of fact, but to present the law, as on a motion for a new trial. Per PAINE, J.

An appeal in an equity case brings up the whole case, law and facts, to be tried *de novo* in the appellate court, and §§ 18, 19 and 20, chap. 132, R. S., are not applicable to such a case. Per PAINE, J.

The supreme court will reverse a decree entered in a cause. when the court below should have granted a continuance instead of proceeding with the cause. *See note.*

This was a suit commenced by bill, to foreclose a mortgage given with a promissory note which was therein declared to be collateral to the mortgage, in Fond du Lac county. The bill shows that David P. Mapes and his wife were the mortgagors, and David P. Mapes and Timothy J. Mapes, the makers of the collateral note ; that the mortgage and note were dated and executed the 13th of June, 1854, for the principal sum of $1500, with 12 per cent. interest, to fall due on June 13th,

1856; that the note was made payable to George N. Lyman, or bearer, and the interest of Lyman in the note and the mortgage were assigned Oct. 28, 1854, by Lyman to Ezra L. Northrup, Edward P. Brockway and Thomas B. Robbins, and the assignment recorded November 1, 1854, and the *interest of these three assignees* was again assigned to the respondent, June 18, 1856, and recorded June 24, 1856; that in both instances the transfer was made for a good and valuable consideration, and in the ordinary course of trade when said transfers were made, with the understanding and belief that the note was a good and subsisting demand, and that no defense, equitable or otherwise, existed against the same or any part thereof; that the whole amount, principal and interest, was unpaid; that no proceedings had been had to collect the same; that Timothy J. Mapes, John Wrightman, Henry T. Henton and John Ren, have or claim some interest in the premises mortgaged, arising subsequent to the mortgage. The usual prayer for foreclosure and sale is added and the oath of defendants to their answer, is waived.

The answer of Timothy J. Mapes and David P. Mapes admitted the execution and delivery of the note and mortgage, and then proceeds: Denying, that any valuable consideration was ever received by them for the execution of the promissory note, and the mortgage, and they expressly charge the truth to be, that at about the time of the execution and delivery of the note and mortgage, George N. Lyman charged the defendant, Timothy J. Mapes, with the crime of larceny, in stealing from George N. Lyman a large sum of money, and threatened to prosecute the defendant, Timothy J. Mapes, in a criminal prosecution for the offence and send him to him to the state prison, alleging that he had ample proof of, and he, George N. Lyman, knew of the commission of the same, and pretended that nothing could prevent the conviction of Timothy, unless David and Timothy would pay and remunerate him for refraining to prosecute Timothy, and suppressing the prosecution for the offence of larceny, and George N. Lyman then proposed to Timothy and David P. Mapes, his father, that he would compound and cancel the offence of larceny and refrain and suppress all prosecutions against Timothy for the offence, and would not in any event prosecute Timothy for the same, nor give any evidence thereof; provided Timothy and David P. Mapes, his father, would execute and deliver to him a promissory note for the sum of

fifteen hundred dollars, and David P. Mapes and Ruth, his wife, would secure the payment of the same by executing and delivering a mortgage on real estate.

And the defendants say, they did thereupon execute a promissory note for the sum of fifteen hundred dollars, and David P. Mapes and Ruth, his wife, did also, at the same time, execute a mortgage on real estate to secure the payment of the note, and did deliver the note and mortgage to George N. Lyman, and they expressly charge that the promissory note and mortgage are the same that are mentioned and described in the bill of complaint, and were executed and delivered to George N. Lyman for the cause aforesaid, and for no other consideration whatever. And the defendants expressly charge that the promissory note and mortgage were executed and delivered to George N. Lyman to compound and cancel the crime of larceny with which he had charged the defendant Timothy in stealing from him, George N. Lyman, a large sum of money, and to refrain and suppress all prosecution against Timothy for the offence, and would not prosecute him for the same or give evidence against him on it; and the defendants further charge that there was no good or valuable consideration for the promissory note and mortgage, and that the same were given and executed against public policy, and are null and void. And they deny that any consideration was paid for either of the assignments, or that the same were taken in the ordinary course of trade, or that the parties so receiving them then thought them good and subsisting demands, or that there was no defense to the same; and that the assignees all well knew when they took the same, that they were given for the compounding of a felony, &c., with full notice, &c.

The case was changed to Milwaukee circuit court, where Henton and Wrightman filed their answers under oath, alleging nearly the same matters as had been averred by the defendants, Mapes, as to the consideration of the note and mortgage, and that there was no other consideration or inducement whatever; that they are advised and believe that it is not material to their defense against the mortgage, whether or not Timothy was guilty of the crime, as in either case the mortgage is equally invalid and of no force on the mortgaged premises; that however, the accusation was not true; that Timothy was not guilty of the crime, but that the same was falsely charged against him by Lyman, for the very purpose

of procuring from his father a mortgage on the premises, in consideration of Lyman's concealing and hushing up the accusation, and not prosecuting Timothy for such alleged crime.

The answer insisted that the assignments were made with knowledge of all the facts on the part of the assignees, before they took the note and mortgage, and that they paid no consideration for the same.

After replications to the answers were filed, Henton and Wrightman filed a cross bill, in which they set up the facts of Timothy J. Mapes being clerk to Lyman, of the accusations, threats and promises, the making of the note and mortgage by means of the accusations and threats, &c; that they had purchased the premises in good faith of David Mapes; that therefore the mortgage was voidable, and ought to be surrendered and cancelled; and the usual prayer for relief.

To this Catlin answered, that he could not state anything as to the accusations and threats, &c., and so denied that the consideration was properly stated in the cross bill; but insisted it was for a just debt: and that they paid a full consideration in good faith for the several assignments, and denied all knowledge of the facts set up in the cross bill.

To this answer there was a replication.

On the trial David P. Mapes testified that he knew all the parties, &c., and knew the consideration of the mortgage, &c., and said, "we had dealings with Mr. Lyman, and had sold one mill to him, and my son, Timothy Mapes, went into his employment. After he had been in his employment some time we were building another mill and had got it nearly finished. My son was to work for Mr. Lyman with a salary, reserving a part of his time to collect our old store debts, and attend to the duties of the post office, I being postmaster of the place. My son and I were in partnership. We have a running account with Mr. Lyman. Mr. Lyman came to me and said he must have a settlement; we must pay him at once. We got together all the accounts we had against him and he had against us. We made that settlement and found a balance his due of about $600, for which he demanded a mortgage on the stone mill. My answer to him was that he could not have a mortgage on that mill. The other mill he had swept from me, and this I was determined to keep for my old age. I told him he could not have it on the stone mill, but would give him a mortgage on the farm, which I did. After he had got this mortgage he set up the claim that

my son Timothy had been purloining property from his store. After he had made the charge, my reply to him was, I will look into the matter; that it was not impossible my son had done so, but few fathers would believe their son doing so; that all rogues had fathers, and that I would investigate the matter." He made the charge to me that Timothy had purloined money from him, and that he could prove it by his brother-in-law. I inquired of him where he supposed the money had been made use of, if any had been taken; that my son had not left his employ a day from the time he went in until the charge was made. Lyman said, "you must have used my money in building your second mill." I went through with him, taking up the bills and the items of the building of it, and the $600 mortgage coming to him. I told him how everything had been bought; mill stones, cloths and all about the building. When he got through he said, captain, you are a great financier; that it was all right; but still, my brothers-in-law are willing to swear to the fact that they had put money in the drawer and it had not been accounted for in the cash book. One of the charges was a sum of $7 or $9. I said, might not his brother-in-law have done it. He said he had been to Fond du Lac and taken counsel; that he had taken Mr. Mead with him, and that he had been there told that they could prove enough to send my son to the state prison. He said that unless I settled with him he would commence a criminal prosecution at once. He wanted to know what we should be willing to give. I said we would give nothing; that me and my wife examined my son, and he said he had taken nothing but what he had accounted for; and that if we should give anything it would be to prevent any of the family from being arraigned for a crime. My son insisted upon not giving anything. Mr. Lyman got up his horse and carriage and drove up in front of my house, and then to my son's house, and stated that he was going to Fond du Lac to commence a criminal prosecution. I saw the distress of the families and went to his house and asked him what it was he wanted? His reply was, that he would name a sum on which he must be secured by that stone mill. I told him to name a sum. He named the sum of $1500, and a mortgage on the stone mill; that he would stop all proceedings. I told him that he had done us all the injury he could, but dollars and cents were nothing to a father if his son were to be arraigned. He said that no one knew about it but him-

Catlin vs. Henton et al.

self and his brothers-in-law, and that that would be the end of it. My son was unwilling to consent, but my wife prevailed upon him. We went to Mr. Lyman's office. There was no one present but myself, my son and Mr. Lyman when we executed the mortgage. My son took it over to my wife and she signed it. She being helpless. I do not recollect before whom the acknowledgment was taken. It might have been before my son, who was a notary public. This interview was in the daytime, in the back office of Lyman's store. *There was no other consideration for the execution of the note and mortgage than the agreement not to prosecute my son, except an agreement to conceal and not divulge the matter*, he saying that none knew it but his brothers-in-law. He gave no reason why the sum should be $1500. I asked him to fix a sum and he said $1500 with a mortgage on the stone mill at twelve per cent. interest. The note and mortgage in this case are the note and mortgage given at that time for the consideration. It was not pretended by Mr. Lyman that this note and mortgage were given for any other sum. It was only a few days before that we had had a full settlement, and we had given him a mortgage for the sum of $600 on the farm. He did not set up or show how he made up the $1500, but kept saying that Timothy ought to confess something, but Timothy said he had accounted for every dollar.

*Timothy J. Mapes.*—I am one of the defendants in this suit, and the son of the last witness. I was in the employ of Mr. Lyman, at Ripon, near a year. I was clerk and bookkeeper. I was his chief managing man about the store. I executed the note in this case jointly with my father. I think the note and mortgage were executed on the day they bear date. Mr. Lyman charged me with stealing money from the drawer. The accusation was, that I had taken sums of money at different times, and not rendered any account in the cash book. Mr. Lyman stated that he had taken steps, and was convinced that I had taken the money. I denied the fact, and stated that I had had trouble to keep the cash account balanced correctly from the way the business had been done. Different ones having access to the business, paying out cash for grain, wood, and other articles, and making their own entries in the cash book, that as far as I knew, it was correct from the way business had been done, and cited him to an instance where the cash book had been short about $90 for some days. That it was so from his own carelessness and

Catlin vs. Henton et al.

blunders: that the business had been done throughout in the same way from the commencement. In balancing my cash account one night, I found it was about $90 short. I tried to find out the mistake, but got no clue to it, and left the cash book unbalanced until next day. The next day I asked Mr. Lyman if he could throw any light on the subject. I also asked the other clerks in the store for information, but could get no clue to the cause of its being short. A short time afterwards Mr. Johnson's little girl came in for some small item, and brought the pass book to have the item entered on it. On this pass book was an item of $90 paid to Johnson, about the amount the cash book was short, and the same day. The cash had been charged on the pass book, and had not been charged on the cash book or day book. The entry in the pass book was in Mr. Lyman's handwriting. I told Mr. Lyman I had found the error, and had balanced the cash book accordingly. I referred him to other cases where the book had been balanced the same way, through errors that occurred, and told him that if I had had the whole handling of the books and the cash, I could have kept the thing nearly straight. Mr. Lyman said that he had evidence, and had taken steps to make the thing sure, before he accused me, and unless the thing was fixed in some way, he would prosecute me. I made the matter known to my father, and after that the conversations were mostly between my father and Mr. Lyman. I think I had no further conversation with Mr. Lyman until after the execution of the note and mortgage. This was a few days previous to the execution of the note and mortgage. I think it was but a very few days after the charge was made, until the execution of the note and mortgage. It was a proposition from Mr. Lyman to settle the matter by a mortgage on the mill. I was notified to come and sign the note and mortgage at Mr. Lyman's store. I refused, and did not go to Mr. Lyman's store until the arrangement was made to give the mortgage. I then went. At the store Mr. Lyman repeated that he wished I would confess what amount I had taken. I repeated that I had taken nothing, and had nothing to confess. The note and mortgage were given to prevent a proceeding for larceny. It was the understanding between all the parties that Mr. Lyman would not proceed in the matter. There was no other consideration for the note and mortgage. If there was any great excess of money over the cash account, it was investigated; if it could not be found out, it

was marked overrun, if it was a small amount of a dollar or two, it was added to the day's sale—the same way with any small amount short—if only a few shillings, it was deducted from the cash sales of the day.

It was a day or two previous to the giving of the note and mortgage, that Mr. Lyman charged me. He called me into the office when he told me. Mr. Lyman told me he could bring witnesses to prove the charge. I do not remember of having asked Mr. Lyman how much money I had taken. He asked me repeatedly how much I had taken. I do not remember of his saying that if I would render an account of how much I had taken, that he would take that, if he did not find out more. Mr. Lyman stated that he was sorry I had betrayed his confidence, that he had placed more confidence in me than any other clerk he ever had. He asked me where I got the money to furnish up my house. I did not enter into any lengthy explanation. I kept no account. I do not remember of his asking me where I received my pictures. I had been in one or two Art Union speculations. My salary was $400 a year. I have a family, a wife and one child. I recollect of his remarking that I lived better than he did. I did not make any explanation. I do not think he asked one of me. Mr. Lyman labored considerably to make me acknowledge. He labored some as to my means of living. He talked some of my means for the mill, and my share. I think he told me that the first intimation he had was, his, on a Sunday, counting over the cash in the box I had left at his house, and finding that it did not agree with the cash book. I had only this conversation with him, and the one at the execution of the notes and mortgage. At this conversation I went either for Mr. Mead or Mr. Robbins. I told either Mead or Robbins that Mr. Lyman sent me, and wanted one or the other to come with me to the store. Mr. Lyman told me that I had been taking money for some months past, and, as near as he could estimate, from $2500 to $3000. I never said to him or Mr. Mead that I was sorry for what I had done. Mr. Lyman never told me that he could only settle the debt, but could not settle for the crime. I cannot recollect the language, but as near as I can recollect, Mr. Lyman said that if $1500 was given on the mill, the prosecution would not go on. Mr. Lyman did not say that this was in settlement of the debt, and not of the crime. I got the pictures from New York. I bought a draft

from Mr. Brockway on New York, for a little over $200, when I was with Mr. Lyman. Mr. Lyman was selling drafts on New York, but did not make a business of it. I drew the drafts and Mr. Lyman signed them. I bought the pictures and furnished my house while with Mr. Lyman. I sometimes paid the men at work on the mill. My father did sometimes. I may have paid some of the men at work on the mill at Mr. Lyman's store. My father did not always send the men to me to get their pay. I was interested in the American Art Union while I was with Mr. Lyman, and drew some pictures. I may have borrowed some money and replaced it at Mr. Lyman's. I may have borrowed during the time I was with Mr. Lyman, $5 to $10, and put the scrip in the box until I replaced it. I never borrowed $50 nor $40. I do not think I ever borrowed over $10 or $12. I do not know whether I denied it in the presence of Mr. Mead or McKnight, or any others. I always denied it. Mr. Mead stated that he had placed a marked piece, I think it was a $5 piece, in the drawer, and that it was gone. I said that I did not know any thing about it—that I made change. He said I must have taken a large sum of money. All the first conversation was as to whether I had taken the money. My father talked with him after that. All the money paid for grain was charged as so much paid for grain. There was no separate money box. It was all put into one box. When payments were made for any thing, it was taken from the box. The payments made for grain, &c., were made out of the box, unless when odd change was wanted it was taken from the drawer. The cash account was balanced, generally, every night, unless it was late at night. When late, I carried the money home, and brought it back and made the entry in the morning. Most of the time after I went there, I carried the money home in a tin box, and brought it back in the morning. I cannot say exactly where I got the $200 I bought the draft with. I got it from different sources at different times. I do not know why I did not buy the draft from Mr. Lyman; but because I did not see fit. Mr. Lyman had money in New York sometimes. I kept the book; knew all about it. I never sold gold—never took a $20 gold piece to sell, only to make change, or oblige a customer. I kept no cash book; had the post office money and my own. Did not keep it mixed up with Mr. Lyman's.

The accounts on which I collected money, were the ac-

counts of the old firm of T. J. Mapes & Co. There was a large amount. I could not say within a few hundred. I never took any money without putting a script in the drawer, or charging myself. I may have for a little while, but returned it. I never took a dollar in my whole employ with Mr. Lyman, that I did not account for. I had a carpet in the house and stair carpet charged to me in Mr. Lyman's books. I had nothing better than a wooden chair in the house; I had no sofa, had no servants, kept no carriage. I lived in a very economical way, I consider.

Several witnesses testified to the notoriety of the transaction of giving the mortgage at Ripon.

*George N. Lyman sworn.* I recollect the time when this note and mortgage were executed. They were handed to me at my office in Ripon, on Tuesday afternoon, June 13, 1854. The note and mortgage were brought in by the two Mapes; the elder one, I think, handed the papers into my office. I had a conversation with T. J. Mapes previous to this, as to his having appropriated my money to his use. The first conversation, I think, was on Monday. I asked him to walk into the counting room with me, and told him he had been doing a different kind of business from what I expected.

I said I was surprised at his taking the course he had, after I had placed so much confidence in him; that he had charge of my notes, money, and books; that he had an opportunity to take from me as much as he had liked; that I had taken the course to ascertain, for a certainty that he had taken money from the daily sales of goods in the store. He asked me what were my reasons for thinking he had done so. I told him I supposed he was somewhat surprised that I had ascertained that fact; that I presumed he thought it had been done in such a shape that there was no possibility of my knowing that he had taken the money. He said very little about it, only that he wondered I knew that he had any money. I had the next conversation with him on Tuesday. On the first conversation I had made no threats, nor did I accuse him of stealing or larceny, only that he had taken money from me. The next interview was with Capt. Mapes, on Tuesday morning, at my store. He called at my store, and introduced the conversation. He called me to go into the counting-house, as I was about leaving the store. He said he understood I had accused his son of stealing money. I told him that I had. He thought it very strange. I said

Catlin vs. Henton et al.

I knew it to be a fact; that I had plenty of proof. That Timothy would tell him the whole story if he only asked him. In the first interview I had with Capt. Mapes, I did not make a charge of larceny against his son, other than that he took the money. Capt. Mapes proposed my taking a mortgage on the stone mill, rather than the money. I insisted upon having the money Capt. Mapes' son had taken; he said he had not the amount of money on hand; that was the objection he made at that time. His first proposition then was to give me a deed of the farm, subject to that mortgage. I told him all that I wanted was to get what was owing me. I told Capt. Mapes that I would leave it to Timothy, if he had kept an account of what he had taken, and then to take the offer of D. P. Mapes of $1,500, which he had made me, which was to give me a mortgage on his mill, and his wife should execute the mortgage; and I refused it at first. I did not tell Capt. Mapes, when he went over the statement of the cost of the mill, and of the financiering, that it was all right, and that I was satisfied that none of it came out of me. The other conversation was in the forenoon of Tuesday. I never told him I could send him to the State's Prison, or threaten him at all. I went down to Fond du Lac on Sunday, and was posted. I consulted with Eldredge and Mr. Hamilton, and knew exactly what to do. I told the captain that the money I received was not sufficient for the goods sold; that there was money taken besides from the drawer, and I set a watch to see who took it, as I did not know then who did it. I told the captain the basis upon which I had reckoned the amount taken. I told him that I estimated it not to be less than $2,500, from that to $3,000. I never told either of them that I would settle and conceal the crime, and would not prosecute it. I repeatedly told them to the contrary. I did not agree to forbear to give testimony or any thing of that kind. The captain asked me for a receipt in full, when he brought the note and mortgage into the counting-room. I told him I would do no such thing. I told him I was then only settling for what I knew of; that I had not looked over my notes or papers to see what more might have been taken, which was the reason I did not give a receipt. The papers were brought to my office executed, and, I think acknowledged. I might have drove round town with my horse; it had no reference to Mr. Mapes in particular. I did not make any threat of going to Fond du Lac, and hav-

Catlin vs. Henton et al.

ing Timothy arrested if the mortgage was not executed. The note and mortgage was given me for money Timothy had taken from me from time to time, and a pair of scales and bolting cloth. It was in reference to my notes and accounts, and for what I knew of that, this $1,500 note was given, and not for things I had not examined into. Capt. Mapes made me the offer of $1,500 himself; it was for a pair of scales, for the mill and bolting cloth and money on book account, money Timothy had stolen.

I think it was about three months previous to the giving of the note and mortgage, that I suspected Timothy did not account for all the money he received. After I had begun to suspect, I employed Sumner McKnight to watch the money drawer and count the cash. I then employed W. H. Mead, Mr. Van Amman was employed also. At the time the note and mortgage was delivered, and when the receipt was demanded, there were present myself, T. J. Mapes, and David P. Mapes. Mr. McKnight was near the door, which was not shut, for the purpose of hearing what was said. At the time the note and mortgage was delivered, I did not press Timothy to confess, nor at any other time. I said to him that if he had an account, he would know better than I did what he had taken, and I would take his statement. Timothy was never arrested for the offence, nor had I any talk with any officer about arresting him. Mr. David was in the adjoining room when Capt. Mapes came in to make the offer of the farm. I told him to remain, as I wished him to hear what was said; he was within hearing. This was the time the captain offered to give me the $1,500, because he could not raise the money. Timothy counted the money at night, but almost at all times the entries were not made up until the morning. This was almost his invariable practice, and it was so when there was a deficiency.

*Cross examined.* Timothy J. Mapes was in my employ about a year and a half. I think I paid him at the rate of $300 the first year, and at the rate of $400 the second. There was no arrangement by which Timothy was to have the time necessary to collect the old debts of of T. J. Mapes & Co. The post office was in my store a spell.

The first time I knew of money being taken, was one day I had been in the store the most of the day. I counted the money in the drawer; the amount of cash sales during the day, I think, was between $40 or $50. In the morning I

Catlin vs. Henton et al.

looked at the cash book, and the entry of sales was not so much by $9 or $10. Mr. McKnight and Mr. Mead were clerks in my store at the time; they had access to all parts of the store, as well as Mapes. I did not exclude any of them from the cash drawer. When I found the amount of sales entered on the cash book did not agree with the cash drawer, I thought there might be some mistake. Afterwards I was satisfied it was Timothy, though at the time I could hardly think Timothy would do that kind of business. Some time afterwards I had reason to suspect him. I went to the drawer and took some money out of my pocket and put it into the drawer; I think a five and three dollar bill. In the evening, when Timothy had gone to tea, I counted the cash in the other room, and found some $70 or $80. In the morning I counted the money over again; the money in the cash drawer was $17 or $18; the $70 or $80 were in the other room, in a tin box. The amount on the cash book, when it was balanced, was as if the $8 had not been put in at all. This was before I spoke to any one. I afterwards spoke to McKnight. I afterwards made other discoveries with McKnight, by counting the money with McKnight, and looking over the cash book in the morning. The cash received in the day for sales when counted was short on the cash book in the morning. McKnight watched the drawer after we had counted the cash in the evening, to see what was put in the drawer. I think the whole amount I knew of Mapes taking, or that I discovered, was about $40 or $50. I have reason to believe that $2,500 had been taken. At the time of the settlement, I said I had not any knowledge of the amount that had been taken, but that I would leave it to Timothy. I was satisfied it was better to take the $1,500 at the time than to take any other course. I calculated to get more than that; that was the only calculation I had. I thought there was more than that belonged to me. I intended to look into the matter and make things a little snugger, and collect it if I could, if the property was not too much encumbered. I do not think I accused Timothy of stealing at any time; only that money had not been charged or entered. I did not at any time say to Timothy or his father that, unless the matter was settled, I would proceed criminally against Timothy.

*Ques.* Did you, about the time of the execution of these papers, say to Mr. A. M. Skeels, of Ripon, that you had told Timothy or his father what they would or should do; and

that if they did not do it, you would prosecute Timothy for the crime, or anything to that effect?

*Ans.* No time before the execution of the papers did I say anything of the kind, I think. I think I had a little conversation with Mr. Skeels after the execution of the mortgage. I think the remark was, that I had settled up for the lumber, money and other things that was had, that I had charged, and that I had settled with them. I do not think I said anything about Mr. Skeels keeping it still, particularly. I may have said that the captain wished it to be kept quiet. The captain requested me, or said I want to have your lips closed. I think I said it was not policy for me to say anything about it, as he had been keeping my books for some time. Mr. Dowd was in the sitting room at the time of the conversation at my parlor. I told him to remain and hear what was said. The reason was, my counsel had told me it would be as well to have some one present. My particular object was to get my money without being obliged to have particular trouble, more than I could help in the matter. Timothy, before this, I considered a man of good standing. I did not at any time make any agreement not to say anything about it. It would not be policy on my part, as he kept my books. I do not recollect of Capt. Mapes saying in my parlor, "Mr. Lyman, name your own sum, make up the figures, and let me know what it is, and I will settle it rather than suffer any exposure of my family." Previous to this, I thought him a respectable man. Under the circumstances I did not think it was my duty to prosecute him. I concluded that if they owed me anything I could collect it, as I would any other debt. If they had not settled, I would have examined things, so as to have made them snugger, and see into the matter.

Very seldom I took money from the drawer and paid for grain, &c., without charging it on the cash book. I recollect the item of $90 Timothy speaks of; I found it out myself, I think before he spoke of it. I do not know that I could do such things oftener than any other man. I have no knowledge of having claimed the scales, nor have I seen them since. I have recollection of sending to the mill for those scales after Henton & Wrightman bought the mill, and the man took them away. Capt. Mapes came with his millwright to my place for some bolting cloth; I told him I had some ready made, and if it would suit, to keep it; if not, to

bring it back. I never knew of the scales or the bolting cloth being sent back.

*Richard Catlin.* I had no notice at the time I bought the bond and mortgage of any defense. I paid the full amount without interest at 12 per cent.

*Cross examination.* It was 12 or 16 days past due when I bought it. I live in Ripon. I am in no way acquainted in business with Mr. Lyman. I was well acquainted with Lyman and Mapes. I did not hear that the matter of Timothy Mapes had been settled by a mortgage on the stone mill.

*Direct examination.* Mr. Henton called on me after suit had commenced, to see if I would not take some other security. Mr. Wrightman called also, and said so.

Several other witnesses were examined touching the same facts testified to by the parties to the mortgage, but their evidence is equally contradictory and uncertain as the principal witnesses.

The parties, plaintiff and defendants, having rested, and the cause being duly submitted, the judge of said circuit court of Milwaukee county afterwards filed the following, as and for his decision.

" I find that the note and mortgage were made and delivered and assigned as in the bill set forth, and that the plaintiff is the *bona fide* holder thereof.

" In the conflict of testimony, I must find that the defense has not been sufficiently established, and that a judgment of foreclosure must be ordered."

Upon which judgment was entered, according to the finding, for the sale, &c., of the premises. And the defendants, Henton & Wrightman, and plaintiffs on the cross bill, appealed to this court.

*Waldo & Ody,* for the appellants.

*Chas. A. Eldridge & J. E. Arnold,* for the respondents.

*By the Court,* PAINE, J. This was an action to foreclose a mortgage, originally given by David P. Mapes and wife to George N. Lyman, and transferred by several assignments to the respondent. The defense set up in the answers of David P. Mapes and Timothy J. Mapes, as well as in the answers of the appellants, who were subsequent purchasers of the

property, after the mortgage was given and recorded, is substantially as follows: Timothy J. Mapes was head clerk in Lyman's store, and was charged by Lyman with having at divers times taken large amounts of money for which he had not accounted; and was threatened with a criminal prosecution therefor. And that this mortgage was executed on the demand of Lyman by David P. Mapes, the father of Timothy, to avoid such criminal prosecution, and under an agreement with Lyman that if it was given, the prosecution should be "hushed up."

The first point of the appellants is that the judgment must be reversed, because the finding of the court below is not a sufficient compliance with the provisions of the code upon that subject. This is a question that has been the subject of much consideration by the court at the present term, and which is not without difficulty. It was conceded by counsel in this case, and has been in other cases where the matter has been incidentally alluded to, that the code did not, and could not, have the effect to deprive this court of the power to review both questions of fact and law, in equity cases, which power was embraced in the appellate jurisdiction conferred on it by the constitution. And if this is so, it seems difficult to imagine any good reason why, when the evidence is brought before this court in such a case, the judgment should be reversed solely for the reason that the finding of the court below was not sufficient. It is very easy to see why it should be so in a case where this court cannot review the facts. For then it is in the nature of a special verdict, and this court in determining whether the judgment was correct, could not go behind the verdict. If that was not sufficient to support it, then it could not be supported.

But in cases where this court not only has the right, but is bound to pass upon questions of fact, there, though the finding of the court below is not sufficient to support the judgment,

Catlin vs. Henton et al.

yet if this court on looking into the evidence finds such facts as are sufficient, I cannot see how it would be justified in reversing the judgment. It has the evidence before it. It can see that both in fact and law the judgment is right, why then should it be reversed ? Simply, it is said, because the finding below was insufficient. But this certainly is not a reason, when it is conceded that this court may itself find the facts, and thus supply, in its own finding, what was lacking in that of the court below.

Suppose the finding sufficient, yet this court is, not bound by it. If satisfied from the evidence that it is wrong, the judgment may be reversed. And if, when the finding is sufficient, we may reverse the judgment, because satisfied from the evidence that it is wrong, why may we not, on the same principle, where the finding is insufficient, support the judgment, if satisfied from the evidence that it is right ? Both rights follow from the power of the court to pass upon the facts ; and I cannot see how it can surrender either, without abandoning this power.

Difficulties may arise in applying the provisions of the code, growing out of the different functions performed by this court in reviewing equity and law cases. But as it is conceded that this difference cannot be abolished without changing the constitution, it follows that the code must be construed and applied in a manner consistent with the proper exercise of these different functions. And, if this is done, I cannot see how we can reverse a judgment in a case where we have the power to find the facts, with the evidence before us, merely because the judge below did not file a sufficient finding.

We were referred on the argument to several authorities in New York and Missouri, where such finding was held necessary. *Sisson vs. Barrett*, 2 Coms. 406, was an action at law, where that rule is of course proper, as the finding supplies

the place of a verdict. *Sands vs. Church*, 2 Seld., 347, was an equity case. But the decisions of the New York court of appeals do not reach the point presented here, for that court holds that it has no power to review the facts in such cases. *Newton vs. Bronson's Executor*, 3 Kernan, 587. Conceding to this court the power to review the facts on an appeal in an equity case, the office it performs is more like that of the New York supreme court on an appeal from a judgment at special term. And in *Cady vs. Allen*, 18 N. Y. Reports, 573, the court of appeals in referring to the different powers of the two courts says: " It was competent for that court to examine the evidence and find the facts differently, and on that ground to reverse the judgment rendered at the trial. But we must take the statement as we find it in the record. The appeal to this court is upon the law only, and we are to determine the law, after all matters of fact are determined and embraced in a proper statement or finding." From this it would seem very clear, that the decisions of the N. Y. court of appeals, that the finding must support the judgment, are not applicable to this court in determining an appeal in an equity case where it may decide both fact and law. And the decision of that court in *Dunham vs. Watkins*, 2 Kern., 556, shows that they considered the requirements of the code in regard to the exceptions and finding of the facts inapplicable to a case where the appellate court may review both fact and law.

In Missouri the court first held that an insufficient finding was not ground of reversal, but afterwards held that it was. And then the legislature repealed the provisions requiring a finding. But before this repeal they seem to have made no distinction between law and equity cases, as to their power to review the facts, as appears from *Skinner vs. Ellington*, 15 Missouri 438, and *Freeland vs. Eldridge*, 19 id., 325. In the latter case the counsel urged that because it was an equity

Catlin vs. Henton et al.

case the court should review both law and fact. But the court, without determining whether there was any distinction in that respect, held that it could only inquire whether the finding supported the judgment, as no application for a review had been made to the court below, as required by their code.

In conformity with this case, it might possibly be held that the provisions of our code relating to trials by the court, may be applied to equity cases, without defeating the power of this court to review the fact. But it would be necessary for the party then, in order to bring the facts here for review, to make a case and exceptions under § 20, chap. 132, R. S., 1858. But, I confess, that this construction seems to me to be forced, and that the application of this section to an equity case is incompatible with the nature and effect of an appeal in such case. Sections 18, 19 and 20 of this chapter seem to refer to cases only where the judge acts in the place of a jury. The exceptions provided for in § 20 are to have the same effect as on a trial by jury, and the case for a review is to be made in like manner. Now, a case made on a trial by a jury, is not made for the purpose of having the court try over again the questions tried by the jury, but to present the evidence to it for the same purpose for which, under the old system, it was presented on motions for new trial, and to carry it to the appellate court to be considered for the same purpose. But an appeal in equity brings up the whole case, law and fact, to be tried *de novo* in the appellate court, and these sections seem to me inapplicable to such a case, or, if applicable at all, that they cannot be applied with the same effect as in a law case, where the power of this court is entirely different.

I have here stated my own view of the matter, but the court go no further than to hold that the finding in this case, though general in its form, and finding the facts as alleged in

Catlin vs. Henton et al.

the complaint, is sufficient. Where a finding is actually filed in such a case we are not inclined to examine it with the same strictness as in a case at law, because the reasons for it do not exist.

It was urged that the finding does not show what amount was due on the note. But it was not necessary even for a special verdict to find facts admitted by the pleadings. And here the answers admit the execution and delivery of the note, and that nothing had been paid on it. And we think this sufficiently shows the amount due, if anything.

The counsel for the appellant made the further point that in this mortgage the note is referred to as collateral to it, instead of its being collateral to the note. This was for the purpose of taking it out of the rule applicable to the purchases of negotiable paper before due. But although the point is immaterial, from the view we have taken of the case, yet we will say that we think it very clear, that such a description does not change the essential nature of the instruments, so as to make the debt an incident to the security, instead of the security being incident to the debt.

The remaining questions are merely of facts, though there seemed some little uncertainty on the argument as to the precise ground upon which the defense rested. The answers state that the note and mortgage were given to compound a felony; though Timothy J. Mapes avers that he was not guilty of taking the money. But on the authority of *Steuben Co. Bank vs. Matheson,* 5 Hill, 249, it would seem that they do not sufficiently show any compounding of a felony, because they deny that any felony was in fact committed, and show that no prosecution for one was pending. And the counsel, instead of placing the defense on this ground, claimed that the note and mortgage were procured by *duress per minas.* But leaving out of view the question whether the plaintiff would not be entitled to protection as a *bona fide*

Catlin vs. Henton et al.

purchaser, even though they had been thus procured, we think with the court below, that the evidence entirely fails to establish this or any other defense. True, it is supported by the two Mapes, but the testimony of Lyman and the other witnesses quite overbalances theirs, and satisfies us that the note and mortgage were executed by them to secure an amount which they knew and felt that Timothy ought to pay.

·The judgment is affirmed with costs

NOTE.—This case was before this court at the June term, 1857, upon an appeal by David P. and Timothy J. Mapes, from a decree made by the circuit court of Fond du Lac. At the trial in that court, the counsel, E. S. Bragg, for the defendants filed with the court an affidavit, setting forth that he was employed in the case since the commencement of the term of the circuit court, and was not the attorney of record. The issue had been joined since the last term of the court; and that he had informed the defendants, who were in attendance at the court, that under the practice of the court the testimony would not be taken in open court; but it would be referred to a commissioner to take the same, and report to the court; and that the *three months* given by the rules to take testimony would commence from the time when a commissioner should be appointed; and that the defendants, under his advice, had gone home and were not in attendance upon the hearing of this case. That they resided twenty miles distant from the court and could not be procured in time for the trial; that he had advised them that they had a full defense on the merits. Upon this he moved for a continuance, which the court refused; and entered a decree of foreclosure. From which they appealed.

This court reversed that decree, and remanded the case for further trial. The reversal was placed on the ground that a continuance ought to have been granted.