PROCTOR v. LANE, AND BELL, Tr.

When a creditor of an insolvent debtor seeks, in foreign attachment, to charge the trustee for funds which have come into his hands by virtue of a lawful contract, he must show that they are open to attachment, either because the defendant has a right of action against the trustee to recover them, or that the trustee has so conducted with the funds that his title to them has become fraudulent as to creditors.

L., treasurer of the county of R., having embezzled funds of the county, placed in the hands of B. securities to indemnify him against loss by reason of his having become surety for L. upon his official bond. While L. was under arrest upon a complaint for the embezzlement, certain of his friends, for the purpose of preventing the maintenance of the charge for embezzlement, paid through him to his successor in office a portion of the money embezzled, and B. paid the balance, his sole motive being to discharge his liability as surety. The amount so paid by B. was more than the proceeds of the securities received from L. In foreign attachment, *held*, that B. was not chargeable as trustee of L.

FOREIGN ATTACHMENT. Question of the trustee's liability tried by the court. Writ dated April 6, 1882, and served on the trustee the same day.

The defendant, a resident of Exeter, being treasurer of the county of Rockingham, and the trustee and others being the sureties of his official bond, March 23, 1882, went to Portsmouth, and surrendered himself to the sheriff. In the evening of the same day, Bell was informed by the county commissioners that the defendant had surrendered himself to the sheriff, was then in Portsmouth jail, and had confessed that he was a defaulter in his office of county treasurer, and owed the county about $20,000, which he could not pay. Bell was also informed by the commissioners, the same evening, that they had caused the bond to be put in suit, and all Bell's property to be attached. The next morning Bell went to Portsmouth, and asked the defendant to secure him and the other sureties against their liability on the bond. Lane said he had nothing except certain notes and other securities in his safe at Exeter, which he would give him for that purpose. Whereupon Bell wrote, and Lane signed and gave him, the following assignment:

"Exeter, March 24, 1882. For a valuable consideration I hereby convey and assign to John J. Bell all the notes and other securities now in my safe at Exeter, belonging to me, to secure him for any liability on my bond to the county of Rockingham.

George E. Lane."

At the same time Lane gave him the combination of the lock of the safe, and told him in what part of the safe he would find the

securities. On the evening of the same day Bell opened the safe, and not knowing which of the notes belonged to Lane, and which were left with him for collection, the next morning, March 25, he took all the notes he found in the safe, and carried them to Lane, who selected those belonging to him, and gave them to Bell for the purpose stated in the assignment. Afterwards, the other securities included in the assignment came into Bell's hands.

March 24, on complaint of one of the county commissioners, the county solicitor issued a warrant for Lane's arrest, returnable before the police court of Portsmouth; and on the same day Lane was taken before that court, pleaded not guilty, and was ordered to recognize for his appearance on the 8th day of April, to which time the case was continued. March 27 he gave recognizance, and was released from the custody in which he had been since his surrender. April 8 the case was continued to April 10, at 10 a. m.

Between March 23 and April 10, the treasurer's account having been examined by the county auditors, it was found that there should be in his hands, of the money of the county, a balance of $20,976.51. Between $17,000 and $18,000 of the money of the county he had used and lost in speculations, and his sureties were liable therefor in the suit brought against them by the county March 23. Some of his friends agreed to pay so much of that deficit as would leave $8,634 54 to be paid by his sureties. The latter sum Bell undertook to pay for the sureties. April 9, Lane's friends had raised the sum they were to pay less $1,000, which $1,000 they found they would be unable to raise before the trial of the complaint, which was to take place the next day. This $1,000 Bell agreed to pay upon their undertaking to repay him that sum. Lane having resigned his office, and Dow having been appointed his successor, Bell paid Dow $9,634.54 April 10, and Lane's friends paid the rest of the deficit. All the property of the county for which Lane was accountable, being books and papers, and $20,976.51 money, was received by Dow between 10 and 11 o'clock that forenoon, before the trial of the complaint. All the money paid by Bell and by Lane's friends passed to Dow through Lane's hands. The money paid by Bell was paid by him to the county, through Lane as a conduit, in discharge of the liability of the sureties in the suit brought against them on the bond, and was not loaned to Lane. When Bell and Lane's friends paid the deficit, they knew that the deficit had happened by Lane's losing the money of the county in speculations; and they understood the complaint for embezzlement was to be tried that day, and that if the deficit was not paid before the trial, Dow would make a formal demand upon Lane for the money. Lane's friends paid their money for the purpose of preventing the maintenance of a criminal charge of embezzlement against him. Bell paid the rest of the deficit for the purpose of discharging himself and his co-sureties from their liability in the suit on the bond. He knew by

what motives Lane's friends were actuated, and was anxious they should contribute to make up the deficit, because their contributions would leave so much less to be paid by the sureties. His sole motive in obtaining the securities from Lane was the indemnity of himself and his co-sureties, and his sole motive in paying what he paid was to discharge that liability. The amount and value of the securities received by him from Lane are less than $8,634.54. A few days after April 10, $1,000 was paid by Lane, through Lane's friends, to Bell, according to the agreement.

April 10 there was a full hearing of the complaint, upon the merits of the case, in the police court. The solicitor introduced evidence, and the case was argued by the solicitor and by the counsel for Lane: and the state having failed to show any just ground for holding Lane to answer for the offence charged, he was discharged; and he has not been further prosecuted criminally.

The court found the trustee was not chargeable, and the plaintiff excepted, and filed the foregoing bill of exceptions, which was allowed.

*H. Bingham* and *J. W. Towle*, for the plaintiff, cited *Sayles* v. *Sayles*, 21 N. H. 312, and *Weeks* v. *Hill*, 38 N. H. 199.

*Marston & Eastman*, for Bell, trustee, cited Drake At., *ss.* 452–458, 526, 527, 533; *Boardman* v. *Cushing*, 12 N. H. 105; *Andrews* v. *Ludlow*, 5 Pick. 28; *Ripley* v. *Severance*, 6 Pick. 474; *Strong* v. *Smith*, 1 Met. 476.

*H. Bingham*, for the plaintiff, orally. March 23 Lane announced himself a defaulter, a warrant was issued, and he was arrested upon the charge of embezzlement. March 24 Bell procured an assignment from Lane of securities valued at $6,000 to $8,000 to indemnify him against loss on Lane's official bond. April 6 the securities in Bell's hands were attached in this suit. April 10 a criminal prosecution was pending against Lane. No call had been made on Lane to pay over the amount due from him to the county. In fact, there was no evidence of any loss except what resulted from his conduct in surrendering himself. Bell united with friends of Lane, and paid over the amount of the deficit for the purpose of suppressing a criminal prosecution and of hiding evidence. There was no trouble then about the bond. Lane was out of office. There could be no further liability on the bond. Bell has these funds, and must have a set-off, valid against a *bona fide* creditor of Lane, to escape being charged as trustee in this case. Any set-off he may have growing out of an illegal act or contract cannot prevail here. *Weeks* v. *Hill*, 38 N. H. 199. He agreed with friends of Lane to join them and contribute money, in order to hide evidence of crime,—smother evidence,—and paid another $1,000 to clinch the whole business. He knew the purpose in view. He made it

his business as well as they made it theirs. It was his purpose as well as theirs, and he must share the glory or shame, credit or discredit, with them. The end does not justify the means, if the means are unlawful. A man cannot commit murder to collect a lawful debt. By filling up the gap in the treasury, he took away the evidence of crime. It is clear that he acted jointly with Lane's friends. Whatever illegality attaches to one attaches to the others.

If what Bell did was lawful, then I grant he had a fair matter of set-off. But his purpose was to hide the *corpus delicti*—the gap in the treasury. If the money was all there, there could be no embezzlement. If no one was killed, there could be no murder. It was a well understood, hard fought for, consummated concealment of the *corpus delicti.* *Badger* v. *Williams,* 1 D. Chip. 137 ; *Wilbur* v. *How,* 8 Johns. 346. · The books are full of such doctrines. Paying over the money had its effect: there was no deficit in the county treasury. The bill of exceptions shows a clear case of embezzlement of $20,000 lost in speculation. Bell knew the crime was perpetrated. They went to work deliberately. Bell wanted to suppress this evidence as a means to get clear of the bond. [CARPENTER, J. Does it make any difference that a criminal prosecution was pending?] No, if the purpose of paying the money was to suppress evidence. He let the money pass through Lane's hands as a conduit. He conspired to pay, not his own debt, but Lane's.

*G. Marston,* for the trustee, orally, in reply. Any question here is on the bill of exceptions. The plaintiff cannot say the facts in his bill are not true. He puts the facts in his bill and the court signs them, and they are to be taken most strongly against the party excepting. This court cannot find the facts. On the facts stated was there error in the finding of the trial judge? The depositions, made a part of the bill of exceptions, do not alter the facts. On the depositions the judge found the trustee was not chargeable. Was there error? [Counsel here contended that certain statements in the plaintiff's written brief are contradicted by the facts stated in the bill of exceptions.]

Some principles no one will deny. No action can be maintained on a contract wicked in itself or contrary to law. *Armstrong* v. *Toler,* 11 Wheat. 258. Bell does not seek to recover anything. When he was informed by the commissioners of the defalcation, Lane was not under arrest, but had surrendered himself. A suit had been commenced on his bond. Bell went to Lane the next morning and asked for security. Lane gave it to him, as it was his right and duty to do. · It was Bell's right and duty to take it. The crime was not mentioned. His whole object was legal and valid. This is not disputed. What then ? The legal title to these securities passed to Bell as security. When did the time arrive that that legal contract became illegal? When he had discharged

the duty which he had assumed, did he lose his claim upon these securities ? No case can be cited where such a transaction is held to be illegal.

But they say he discharged his liability by paying a part of it, and that he paid at the wrong time ? Suppose he had paid the whole $20,000 to Dow, Lane's successor : is it illegal for a person to do what by law he is bound to do ? Bell's property was all attached. It was important to him to get it released. It was all tied up, and he could not use it. It was ruinous. The case finds the sureties were liable to pay. Did he do a wrong act in paying ?

The bill of exceptions says he knew the purpose of Lane's friends was to defeat a criminal prosecution, but his sole purpose was to discharge his liability as surety. If he had waited a few days and paid the whole !

What was the *corpus delicti ?* The crime was complete when Lane used the money. He was guilty then. He confessed the embezzlement. But they say if the money had been demanded and had not been paid over, it would have been some *more* evidence. Why was he not held at the examination ? There was the evidence of his confession. Why was he discharged ? Perhaps the commissioners did not want to prosecute, or the solicitor did not know what evidence there was.

To take the plaintiff on his own ground, what wrong was there on the part of Lane's friends ? Bell might complain that there was no evidence for the finding of what their object was. There was not a ray of testimony as to their purpose, or that Bell knew it. No doubt Lane's friends entertained the hope that he would be allowed to go free. But there is nothing in the bill of exceptions to show that a bargain was made that there should be no prosecution. It all rested in the hope and strong expectation that there would not be.

It was the duty of Dow to take the money when offered, and of Bell to pay it. At what point of time does the crime come in ? *Weeks* v. *Hill,* 38 N. H. 199, has no bearing. In that case the town agreed not to oppose a divorce. They had ground on which they could oppose it. There is nothing of that sort here. The case of *Armstrong* v. *Toler,* 11 Wheat. 258, contains a full statement of the law, and cites several English cases. I say there was no wrong on the part of Lane's friends. Bell was obliged to pay the county. It would have been a crime not to pay. He did what he was obliged to do. He took security for himself and his co-sureties.

Foreign attachment is an equitable action. The plaintiff says it would be equitable to take the securities away from Bell and pay some other person's debt. In Massachusetts it is held that you cannot try a legal fraud in a trustee suit. See *Ripley* v. *Severance,* 6 Pick. 474, where it was held that the trustee could hold funds to pay all he had paid and all he was liable to pay. See,

also, *Pittsfield Bank* v. *Clough*, 43 N. H. 178. In *Catlin* v. *Henton*, 9 Wis. 476, the cashier admitted he had embezzled funds of the bank, and gave a note signed by his father, the defendant, as surety, for the amount of the defalcation, in the hope that his son would not be prosecuted. There was no bargain, no agreement not to prosecute. The defendant was held liable.

In this case the trial judge has found that Bell had no purpose except to relieve himself. The great complaint is that he did not pay the whole. It made no difference whether he paid the money to Dow, or sent it through a third person. See *Faikney* v. *Reynous*, 4 Burr. 2069; 1 Bish. Cr. Law, *s.* 505.

SMITH, J. The plaintiff seeks to charge the trustee, upon the ground that the payment by him of $9,634.54, April 10, 1882, was made to defeat a criminal prosecution, that such payment is against public policy, that the money advanced to the defendant was in fact a loan to enable him to defeat a criminal prosecution, that the trustee combined with Lane's friends to pay, not his own debt but Lane's debt, and that their purpose was to suppress and destroy the evidence of Lane's guilt. To these various claims there are several answers.

1. Lane had embezzled the sum of $20,976.51, and Bell as his surety was indebted to the county in that sum. That sum, or so much as Lane should be unable to pay, it was the legal and moral duty of Bell and his co-sureties to pay. A suit had been commenced against him, and his property attached to enforce payment. Concede that the facts assumed by the plaintiff as grounds for charging the trustee are warranted by the bill of exceptions, the inquiry is, What evidence of the embezzlement did the payment by Bell and Lane's friends suppress or destroy? The embezzlement had already taken place; the crime was complete when the money was taken; Lane had confessed it, and surrendered himself to the sheriff; the commissioners had instituted a complaint against him for the crime, which was then pending, and an official examination of his accounts had disclosed a deficit of $20,976.51. None of these facts did the payment suppress or destroy. It tended, rather, to confirm them. But it is claimed that if Bell had delayed until a demand could have been made upon Lane by his successor in office, his inability to comply would have furnished more evidence of the crime. The charge then is, that Bell and Lane's friends conspired to suppress, not evidence which already existed, but evidence which the prosecution expected would come into existence when Dow should make a demand upon Lane for the amount of the deficit. The evidence in fact never existed. The fact of the embezzlement remained after the payment as before. The payment neither destroyed the fact nor the evidence of the fact.

2. But the facts assumed by the plaintiff as grounds for charging the trustee are negatived by the findings of the trial judge.

The bill of exceptions finds that the money paid by Bell was paid to Dow for the county through Lane's hands in discharge of the liability of the sureties in the suit brought against them on the bond, and for that purpose, and was not loaned to Lane; that his sole motive in obtaining the securities from Lane was the indemnity of himself and of his co-sureties; and that his sole motive in paying what was paid was to discharge that liability. These findings negative the idea that Bell's purpose was the suppression of testimony, and dispose of the grounds on which the plaintiff seeks to charge the trustee. It was the legal right and duty of Lane to indemnify his sureties, and it was the legal right and duty of Bell to take the security. It was no less his duty to pay after taking the security. That the result might be to render it difficult or impossible for the government to obtain further evidence of the embezzlement by making a demand upon Lane is wholly immaterial, because Bell had no purpose of destroying or suppressing evidence. Promptness in paying, when a person's sole object was to discharge his liability, is not such dereliction of duty as should be followed by the infliction of a penalty in a legal or equitable proceeding; and equity especially does not punish even a fraudulent party by the forfeiture of what is fairly due him for payments and advances. *Pittsfield Bank* v. *Clough,* 43 N. H. 178; *Forist* v. *Bellows,* 59 N. H. 229; *Weeks* v. *Hill,* 38 N. H. 199.

3. The right of Bell to hold the funds assigned to him as indemnity for the money paid by him as Lane's surety is derived from a contract perfectly lawful. The plaintiff seeks to recover the proceeds of the contract. If the contract, lawful when it was entered into, has since become invalid as to creditors of Lane by the conduct of Bell, the case is as if no contract had been entered into, and the trustee has funds of Lane in his hands received without consideration: the extent to which in a suit of an equitable character he can be held chargeable is the balance after adjusting the equities between him and Lane, and there being no balance he is entitled to be discharged. This is the doctrine of *Weeks* v. *Hill,* *Bank* v. *Clough,* and *Forist* v. *Bellows,* above cited. See, also, *Catlin* v. *Henton,* 9 Wis. 476, *Faikney* v. *Reynous,* 4 Burr. 2069, *Armstrong* v. *Toler,* 11 Wheat. 258, and *Ripley* v. *Severance,* 6 Pick. 474.

*Exceptions overruled.*

Doe, C. J., did not sit: the others concurred.